UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

AIG EUROPE (NETHERLANDS), N.V.,

Plaintiff,

- against -

UPS SUPPLY CHAIN SOLUTIONS, INC.,

Defendant.

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: _____

**ECF CASE**

**MEMORANDUM OPINION &
ORDER**

08 Civ. 2387 (PGG)

PAUL G. GARDEPHE, U.S.D.J.:

Plaintiff AIG Europe (Netherlands), N.V. ("AIG") asserts contract, bailment, and tort claims in this subrogation action against Defendant UPS Supply Chain Solutions, Inc. ("UPS") arising out of damage to an x-ray machine during shipment from the Netherlands to San Angelo, Texas. AIG insured the shipment.

UPS has moved for summary judgment concerning Plaintiff's tort claim, and for partial summary judgment as to liability, arguing that pursuant to the contract between the shipper and UPS, its liability is limited to $9,479.61. AIG has cross-moved for summary judgment, arguing that there was no enforceable agreement between the shipper and UPS as to liability, and that in any event any such limitation provision would be unenforceable under the Carmack Amendment, 49 U.S.C. § 14706(d), and the material deviation doctrine.

The Court's consideration of these motions has been hampered by the parties' failure, in their briefing and supporting affidavits and exhibits, to provide many of the most basic facts concerning the relationship between UPS and the shipper – Philips Medical Systems Nederlands, B.V. ("Philips") – as of March 9, 2004, when the loss occurred. Because the contractual relationship – if any – between UPS and Philips at that time is critical, disputed, and entirely unclear, the parties' motions for summary judgment – except as to Plaintiff's tort claim –

will be denied.  Defendant's motion for summary judgment concerning Plaintiff's tort claim – which is unopposed – will be granted.

## BACKGROUND

### I.    PHILIPS'S REQUEST FOR QUOTE

As best as can be gleaned from the record, it appears that at some point prior to 2004, Philips sent various carriers a Request for Quote ("RFQ").[1]  The RFQ seeks information from "logistics providers" who can provide "door to room transportation [and] inside delivery services . . . . " (Pltf. R. 56.1 Stat. ¶ 1;[2] Gill Decl., Ex. 6 at 2)  In plain English, Philips appears to have been seeking to select a carrier (or carriers) who could transport or arrange for the transportation of Philips' products from Best, Netherlands, to locations in the United States and Canada.  The RFQ seeks extensive information from carriers concerning, inter alia, their facilities, operational capabilities, equipment, manpower, quality control, billing, and pricing. (Gill Decl., Ex. 6)  The RFQ also asks responding carriers to list their project teams, and key personnel, and to set forth how they "plan to approach implementation (short and medium term) of the operations" to be undertaken for Philips.  (Id. at 25-26)

The RFQ states that Philips wants the carrier "to manage shipments under Philips transportation contract for both Sea and Airfreight from . . . Best[,] Netherlands to customer room in USA or Canada," and envisions that the selected carrier will "arrange and pay for . . .

---

[1]  The parties' submissions do not indicate when Philips issued its RFQ, but they agree that the RFQ was issued sometime "prior to 2004."  (Pltf. R. 56.1 Stat. ¶ 1; Def. R. 56.1 Stat. ¶ 2)

[2]  Unless otherwise noted, citations to the parties' Rule 56.1 statements concern factual assertions that are admitted or are deemed admitted because they were not contradicted by citations to admissible evidence.  See Giannullo v. City of New York, 322 F.3d 139, 140 (2d Cir. 2003) ("If the opposing party . . .  fails to controvert a fact so set forth in the moving party's Rule 56.1 statement, that fact will be deemed admitted.").

Sea freight . . . Airfreight and inland haulage." (Gill Decl., Ex. 6 at 5) The RFQ contains a

"tentative schedule" providing that (1) the RFQ will be sent out by Philips on November 8, 2002;

(2) carriers will respond by November 24, 2002; (3) Philips will select a "short list" of carriers

by December 9, 2002; (4) carriers will be required to submit "final rates" by December 13, 2002;

and (5) Philips will make a "final decision" concerning its "logistics provider" in January 2003.

(Gill Decl., Ex. 6 at 2) Whether any or all of these dates were adhered to is not revealed by the

record or addressed by the parties.

   Emery Air Freight – which later became Menlo World Wide Logistics ("Menlo"),

which in turn was purchased by UPS (collectively, "UPS") – was one of the companies that

responded to the RFQ.[3] (Pltf. R. 56.1 Stat. ¶¶ 2, 4; Gill Decl., Ex. 6) UPS's response to Philips'

RFQ – which includes both Philips' queries and UPS's answers – consumes forty-three pages.

The response is undated and unsigned. In its response to the RFQ, UPS confirms that it can

provide the services Philips seeks, including "management of Sea Freight and inland haulage."

(Gill Decl., Ex. 6 at 5)

   Philips' RFQ contains the following provision concerning liability:

*4.10. Liability*

Please define your company's liability and responsibility with respect to errors,
damages, shortages and total loss and your proposals for extended liability.
*Our current coverage is $5.00 per pound, per package.*

(Id. at 21 (emphasis in original)) UPS (then Emery) responded as follows:

**As noted in the scope of this RFQ, shipments will be moved via air from Best
Netherlands to USA and Canada, for K-Van[4] distribution throughout the
USA and Canada. Shipments moved via air will be subject to Emery's**

---

[3] The date of UPS's response to Philips' RFQ is unknown.
[4] "K-Van service" is part of a "specialized transportation group" at UPS that handles delivery of
sensitive, expensive, and high-tech cargo to a specific building location. (Gill Decl., Ex. 3
(Welsh Tr.) at 67-69, 125-126)

> **standard Terms and Conditions of Contract, section XVI Limitations of
> Liability of the attached.**
>
> **Emery's K-Van service will honor Philips' current coverage of $5.00 per
> pound, per package; however, we will require further clarification as to what
> "errors" will entail.**

(Gill Decl., Ex. 6 at 21 (emphasis in original))

## II.    POST-RFQ EVENTS

What happened after Emery submitted its response to Philips's RFQ is entirely

unclear.  Whether Emery or one of its successors, Menlo or UPS, was selected to serve as

Philips' "logistics provider," whether Philips agreed to Emery's proposal in whole or in part,

whether the parties engaged in further negotiations concerning, for example, the limitation on

liability discussed above, whether Emery or its successors performed services for Philips and, if

so, on what terms, is not addressed by the parties and is unknown to this Court.[5]  As discussed

below, what is clear is that the parties disagree as to whether the RFQ, and Emery's response,

constitute a binding contract.

According to the deposition testimony of Steven Holic, Senior Director of Philips

Medical Systems's General Purchasing, Forwarding and Distribution Department, no scope of

service contract was entered into after Emery submitted its response to the RFQ, but UPS issued

a "standard operating procedure document" ("SOP") to Philips concerning the services it would

provide:

> Q.  [W]as there a scope of service contract entered into after this invitation to tender
>     an offer was submitted?
> A.  Not a scope of service contract.  But a scope of service which we call standard
>     operating procedure document.

---

[5]  Philips and Menlo – Emery's successor – entered into a formal contract for transportation
services in October 2004 (Pltf. R. 56.1 Stat. ¶ 16; Eagan Decl., Ex. F), but the loss here occurred
on March 9, 2004.  To state the obvious, the parties' rights, duties, and responsibilities as of
March 2004 cannot be determined as a matter of law by reference to an October 2004 contract.

Q.  And the standard operating procedure document, is that something that was –
was that in place here?
A.  Yes.

(Gill Decl., Ex. 1 (Holic Tr.) at 8, 92)

The SOP, which is dated October 24, 2003, is unsigned, has no effective date, and

does not address liability.  (Eagan Decl., Ex. B; Gill Decl., Ex. 1 (Holic Tr.) at 92-95)

Concerning the services UPS would provide, the SOP states, in part:

3.  RESPONSIBILITY OF ORIGIN SERVICE CENTER
. . .
b.  Emery Ocean Service is responsible for booking the shipment with
Steamship Company, and for transportation to the pier.
. . .
c.  Emery Ocean Service will confirm that goods have been received at the
pier. . . .
. . .
h.  Emery Ocean Service must communicate all pertinent information, and
any abnormalities with Philips Best . . . as soon as they are known . . .
and the KVAN desk as soon as they are known.

4.  RESPONSIBILITY OF KVAN SPECIAL PRODUCTS GROUP

a.  KVAN special Products Group will be the primary point of contact for
Philips Medical at the United States and . . . will coordinate the
activities of the delivery crews, Menlo Worldwide Forwarding, and
other entities related to delivery execution.
. . .
i.  KVAN special Products Group will prepare a Delivery order with BTT
[trucking company] for pickup of container from Maersk and
transportation to hospital delivery site location.
. . .
j.  KVAN Special Products Group will coordinate with the destination
gateways as to when the freight will be picked up.
. . .
n.  KVAN Special Products Group will arrange for BTT to be at the
hospital site one hour prior to scheduled delivery.
. . . .

(Eagan Decl., Ex. B)

The next event addressed by the parties is a January 19, 2004 e-mail from Philips employee Jeroen Van Nistelrooij to numerous Emery, Menlo and, Philips employees concerning the shipment of a Philips cardiovascular x-ray machine from Best, Netherlands, to the San Angelo Community Hospital in San Angelo, Texas.  (Damage to this machine occurred later during transport and provides the basis for this lawsuit.)  The e-mail reads as follows:

> Dear all,
>
> NEW POTB QUESTIONNAIRE
>
> PO: 702948.
>
> Destination:    San Angelo, TX
>
> DELIVERY DATE:   8th of March, 2004.
>
> Attached you'll find another "planned order to Bill questionnaire".
> By sending you this questionnaire, we ask you to pickup, transport, inside deliver, and unpack a C/V [cardiovascular x-ray] system, consolidate the packing materials with the materials of at least one other shipment and return them to Best.
>
> With Best Regards,
>
> Jeroen Van Nistelrooij
> Operations C/V logistic engineer
> and Planned order to Bill co-leader
> Philips Medical Systems
> . . . .

(Eagan Decl., Ex. A)

Whether the parties intended this shipment to be governed by the terms set forth in the RFQ, by the SOP, by a combination of the two documents, or otherwise is not clear. There is no evidence as to Emery/Menlo's response to this e-mail.

In February 2004, UPS "transported" or "arranged for the transportation" of twenty-nine boxes and crates containing the x-ray machine from the Netherlands to the San

Angelo Community Hospital in Texas.  (Pltf. R. 56.1 Stat. ¶ 17; Def. Resp. to Pltf. R. 56.1 Stat. ¶

17)  The parties dispute whether UPS transported the x-ray machine or merely arranged for its

transportation.  AIG asserts that UPS hired American President Lines ("APL") – an ocean carrier

– to transport the x-ray machine across the Atlantic from Rotterdam to New York.  (Eagan Decl.,

Ex. 7 at 10; Pltf. R. 56.1 Stat. ¶ 19)  UPS contends that its "involvement with APL was no more

than arranging the transportation [between Rotterdam and New York] as per [the] RFQ."  (Def.

Resp. to Pltf. R. 56.1 Stat. ¶ 19)

        After arrival in New York, BTT – an interstate trucking company – transported

the shipment from New York to the parking lot of the San Angelo Community Hospital in Texas.

(Pltf. R. 56.1 Stat. ¶ 20; Def. R. 56.1 Stat. ¶ 12)  UPS asserts that "Philips selected BTT to

provide trucking of the unit to [the] hospital's parking area."  (Def. R. 56.1 Stat. ¶ 12)  AIG

contends, however, that "Philips recommended BTT – UPS selected them."  (Pltf. Resp. to Def.

R. 56.1 Stat. ¶ 12)

        On March 9, 2004, BTT delivered the x-ray machine to the receiving area of the

Texas hospital.  (See Def. R. 56.1 Stat. ¶ 16)  UPS had selected Electran Logistics, part of UPS's

"vendor network of companies" (id. ¶ 15), to unload the x-ray equipment from the shipping

container, transport it into the hospital, and unpack it.  (Id. ¶¶ 6, 12, 15; Gill Decl., Ex. 1 (Holic

Tr.) at 39, 41-43)  Mark Korba, an Electran employee, was operating a forklift that day.  (Gill

Decl., Ex. 2 (Korba Tr.) at 10-13, 32-34)  While moving a crate through an inclined parking lot

to the receiving area of the hospital, Korba was required to raise the blades of the forklift in order

to create ground clearance for the cargo while moving uphill.  (Id. at 27-28)  In carrying one

component of the x-ray machine – which weighed 861 kilograms (Def. R. 56.1 Stat. ¶ 50) –

Korba raised the forklift's blades to drive up the incline.  (Gill Decl., Ex. 2 (Korba Tr.) at 27-28,

32-34)  While doing so, the forklift unexpectedly "lurched" forward and the crate toppled over, causing significant damage to a component of the x-ray machine.  (Id. at 32-34)

AIG brings this action as Philips' subrogee, asserting claims for breach of contract, breach of bailment obligations, and tort.  (Def. R. 56.1 Stat. ¶¶ 53, 54)  UPS has moved for summary judgment, arguing that the $5.00 per pound liability limitation mentioned in the RFQ governs, and that its liability for damage to the x-ray equipment is thus limited to $9,479.61.  (Docket No. 17)  AIG has filed a cross-motion for summary judgment, seeking damages of $199,139.14 for the damaged x-ray component.  (Docket No. 22)

## DISCUSSION

## I.   LEGAL STANDARD

Summary judgment is warranted when the moving party shows that "there is no genuine dispute as to any material fact" and that it "is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  "The movant's burden will be satisfied if he can point to an absence of evidence to support an essential element of the nonmoving party's claim." Goenaga v. March of Dimes Birth Defects Found., 51 F.3d 14, 18 (2d Cir. 1995).

"A dispute about a 'genuine issue' exists for summary judgment purposes where the evidence is such that a reasonable jury could decide in the non-movant's favor." Beyer v. County of Nassau, 524 F.3d 160, 163 (2d Cir. 2008).  In deciding a summary judgment motion, the Court "resolve[s] all ambiguities, and credit[s] all factual inferences that could rationally be drawn, in favor of the party opposing summary judgment." Cifra v. General Elec. Co., 252 F.3d 205, 216 (2d Cir. 2001).  However, "a party may not 'rely on mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment.'" Lipton v. Nature

Co., 71 F.3d 464, 469 (2d Cir. 1995) (quoting Knight v. U.S. Fire Ins. Co., 804 F.2d 9, 12 (2d Cir. 1986)).

The RFQ and the SOP contain no choice of law provision (see Gill Decl., Ex. 6; Eagan Decl., Ex. B), and the parties have not addressed what jurisdiction's law applies to the question of whether an enforceable contract existed between Philips and UPS's predecessors. The factual record is likewise not sufficiently developed to permit this Court to perform a choice-of-law analysis. However, "the Court need not 'embark on a choice-of-law analysis in the absence of an actual conflict between the applicable rules of [the] relevant jurisdictions.'" DeBlasio v. Merrill Lynch & Co., No. 07 Civ 318(RJS), 2009 WL 2242605, at *19 (S.D.N.Y. July 27, 2009) (quoting Fin. One Pub. Co. Ltd. v. Lehman Bros. Special Fin., Inc., 414 F.3d 325, 331 (2d Cir. 2005)). Moreover, where the parties' "briefs assume that New York law controls, . . . such 'implied consent . . . is sufficient to establish choice of law.'" DeBlasio v. Merrill Lynch & Co., No. 07 Civ 318(RJS), 2009 WL 2242605, at *19 n.14 (S.D.N.Y. July 27, 2009) (quoting Nat'l Utility Serv., Inc. v. Tiffany & Co., No. 07 Civ. 3345(RJS), 2009 WL 755292, at *6 n.6 (S.D.N.Y. Mar. 20, 2009)); see also Benicorp Ins. Co. v. Nat'l Med. Health Card Sys., Inc., 447 F. Supp. 2d 329, 336-37 (S.D.N.Y. 2006) ("[A choice of law] analysis is unnecessary because the parties' briefs assume that New York law controls and such implied consent . . . is sufficient to establish choice of law." (internal citations and quotations omitted)).

Here, neither UPS nor AIG contends that there is an "'actual conflict between the applicable rules of [the] relevant jurisdictions.'"[6] See DeBlasio, 2009 WL 2242605, at *19 (quoting Fin. One Pub., 414 F.3d at 331). Moreover, the parties cite to New York law and assume that New York law controls as to this issue. (See Def. Resp. to Pltf. R. 56.1 Stat. ¶ 10;

---

[6] Indeed, the basic contract formation principles discussed below likely apply across all relevant jurisdictions.

Def. Reply Br. 8; Pltf. Br. at 23-27)  Accordingly, this Court will apply New York law for

purposes of determining whether it can rule as a matter of law that an enforceable contract

existed between Philips and UPS's predecessors.

> Under New York law,

> [e]xistence of a contract requires "an offer, acceptance, consideration, mutual
> assent and intent to be bound." Benicorp, 447 F. Supp. 2d at 337.  Mutual assent
> requires, in turn, "a meeting of the minds of the parties, and, if there is no meeting
> of the minds on all essential terms, there is no contract." Id.  Indeed, "[i]f the
> Court finds substantial ambiguity regarding whether both parties have mutually
> assented to all material terms, then the Court can neither find, nor enforce, a
> contract." Id. (citing Schurr v. Austin Galleries of Illinois, Inc., 719 F.2d 571,
> 576 (2d Cir. 1983).

Prince of Peace Enters., Inc. v. Top Quality Food Mkt., LLC,, — F. Supp. 2d —, 2011 WL

118245, at *9 (S.D.N.Y. Jan. 12, 2011).

> "Whether a contract is unambiguous is a question of law to be resolved by the

Court." Brass v. Am. Film Tech., Inc., 987 F.2d 142, 148-49 (2d Cir. 1993).  Contract language

is unambiguous when it has a "definite and precise meaning, unattended by danger of

misconception in the purport of the [contract] itself, and concerning which there is no reasonable

basis for a difference of opinion." Krumme v. Westpoint Stevens Inc., 238 F.3d 133, 139 (2d

Cir. 2000) (quotation omitted); accord Trustees of the Four Joint Bds. Health & Welfare &

Pension Funds v. Penn Plastics, Inc., 864 F. Supp. 342, 345 (S.D.N.Y. 1994).

> In order "[t]o determine the terms of a contract[,] a court must ascertain the

parties' intent based on the language they used." Consarc Corp. v. Marine Midland Bank, N.A.,

996 F.2d 568, 573 (2d Cir. 1993) (citing Slatt v. Slatt, 488 N.Y.S.2d 645 (1985)).  The Second

Circuit has noted that

> [i]nterpreting [an] agreement requires consideration as to whether any terms of
> that agreement are ambiguous. . . . An ambiguous term is one about which
> reasonable minds could differ. See Seiden Assocs. v. ANC Holdings, Inc., 959

F.2d 425, 428 (2d Cir. 1992); <u>Care Travel Co. v. Pan American World Airways,</u>
<u>Inc.</u>, 944 F.2d 983, 988 (2d Cir. 1991); <u>Van Wagner Advertising</u>, 501 N.Y.S.2d
628.

<u>Consarc Corp.</u>, 996 F.2d at 573.

"Where reasonable minds could be said to differ because the language the parties

used in their written contract is susceptible to more than one meaning – each as reasonable as the

other – and where extrinsic evidence of the parties' actual intent exists, it should be submitted to

the trier of fact."  <u>Id.</u> (citing <u>Seiden Assocs.</u>, 959 F.2d at 428); <u>see</u> <u>also</u> <u>Fershtadt v. Verizon</u>

<u>Commc'ns Inc.</u>, No. 07 Civ. 6963(CM), 2010 WL 571818, at *12 (S.D.N.Y. Feb. 9, 2010)

("'[W]hen the language of a contract is ambiguous and there is relevant extrinsic evidence

regarding the actual intent of the parties, an issue of fact is presented for [the fact-finder] to

resolve, thereby precluding summary judgment.'" (quoting <u>Scholastic, Inc. v. Harris</u>, 259 F.3d

73, 83 (2d Cir. 2001))).

## II.    WHETHER AN ENFORCEABLE AGREEMENT EXISTED BETWEEN <u>PHILIPS AND UPS CANNOT BE RESOLVED AS A MATTER OF LAW</u>

In order to resolve whether UPS's liability for damage to the x-ray machine is

limited to $5.00 per pound, as UPS argues in its summary judgment motion, the Court must

determine, <u>ab initio</u>, whether Philips and UPS entered into an enforceable agreement concerning

this liability limitation.  AIG asserts that the RFQ "was not a final contract or agreement between

the parties" (Pltf. Resp. to Def. R. 56.1 Stat.  ¶¶ 2-3), and that the RFQ "negotiations never

resulted in a final contract being executed."  (Pltf. R. 56.1 Stat. ¶ 11; <u>see</u> <u>also</u> Pltf. R. 56.1 Stat. ¶

¶ 10 ("there is no evidence that at any time prior to the movement of the shipment at issue

Philips and Menlo actually executed a binding contract incorporating firmly agreed upon liability

terms or clarifying what 'errors' would be covered, as proposed in Emery's response to the

RFQ"); Pltf. Resp. to Def. R. 56.1 Stat. ¶ 45 ("[t]he RFQ was not an agreement")).  UPS

contends, however, that it performed pursuant to this "written agreement" (Def. Br. 1), that there

was an "agreed [liability] limitation [of] $5.00 per pound," and that "[t]he limitation was

expected and enforceable through performance pursuant to the RFQ."[7]  (Def. Resp. to Pltf. R.

56.1 Stat. ¶ 10)  Because there are genuine issues of material fact as to whether Philips and UPS

entered into an enforceable agreement, the parties' motions for summary judgment must be

denied.

      **A.**     **<u>The Language of the RFQ</u>**

      As an initial matter, the RFQ is unsigned and undated, and nothing in it suggests

that Philips is offering to be bound by a $5.00 per pound liability limitation.  The liability

provision of the RFQ reads as follows:

> *4.10. Liability*
>
> Please define your company's liability and responsibility with respect to errors,
> damages, shortages and total loss and your proposals for extended liability.
>
> *Our current coverage is $5.00 per pound, per package.*

(Gill Decl., Ex. 6, at 21 (emphasis in original))  Philips's language merely notifies the party

responding to the RFQ what Philips's current liability coverage is.

      Emery, UPS's predecessor, indicates a willingness to perform subject to the

coverage Philips already has, but its response makes clear that further negotiation will be

necessary before an agreement can be reached as to this term:

> **Emery's K-Van service will honor Philips' current coverage of $5.00 per
> pound, per package; however, we will require further clarification as to what
> "errors" will entail.**

---

[7]  AIG is an insurer-subrogee, and "stands in the shoes" of Philips, its insured.  <u>See</u> <u>Gibbs v.
Hawaiian Eugenia Corp.</u>, 966 F.2d 101, 106 (2d Cir. 1992).  Thus, AIG is subject to whatever
defenses UPS would have had against Philips.  <u>See</u> <u>Great Am. Ins. Co. v. United States</u>, 575 F.2d
1031, 1034 (2d Cir. 1978) ("[Subrogation] is an exclusively derivative remedy which depends
upon the claim of the insured and is subject to whatever defenses the tortfeasor has against the
insured.").

(Gill Decl., Ex. 6, at 21 (emphasis in original))

AIG asserts that "there is no evidence that at any time prior to the movement of the shipment at issue Philips and Menlo actually executed a binding contract . . . clarifying what 'errors' would be covered" (Pltf. R. 56.1 Stat. ¶ 10), and that "the parties never defined which 'errors' would lead to liability."  (Id. ¶ 12)  UPS does not offer any evidence demonstrating that the parties ever reached agreement concerning "which errors would lead to liability," much less that they executed an agreement prior to the March 9, 2004 damage to the x-ray machine.

Based on the language of Philips's RFQ and Emery's response, this Court cannot find that the parties reached agreement concerning a liability limitation.  To the extent that UPS argues that the parties' intent to be bound can be established through extrinsic evidence, that issue must be presented to a jury.  See Consarc Corp., 996 F.2d at 573; Fershtadt, 2010 WL 571818, at *12.

## III.   PLAINTIFF'S CROSS-MOTION FOR SUMMARY JUDGMENT BASED ON THE CARMACK AMENDMENT WILL BE DENIED

AIG has cross-moved for summary judgment, contending that – even if the parties had agreed to a $5.00 per pound liability limitation – the Carmack Amendment governs the shipment at issue and any such liability limitation would be unenforceable.  There are genuine issues of material fact as to whether UPS was acting as a carrier or as a broker here, however, and therefore the applicability of the Carmack Amendment cannot be determined as a matter of law.

### A.   Statutory Framework

The Carmack Amendment to the Interstate Commerce Act of 1887 governs the liability of motor carriers for loss or damage to goods transported in interstate commerce.  See 49

13

U.S.C. § 14706(d).  "In enacting it, Congress intended to provide interstate carriers with reasonable certainty and uniformity in assessing their risks and predicting their potential liability."  Project Hope v. M/V IBN SINA, 250 F.3d 67, 73 n.6 (2d Cir. 2001) (citing Morris v. Covan World Wide Moving, Inc., 144 F.3d 377, 381 (5th Cir. 1998); Shao v. Link Cargo (Taiwan) Ltd., 986 F.2d 700, 704 (4th Cir. 1993)).  The purpose of Carmack is to "relieve shippers of the burden of searching out a particular negligent carrier from among the often numerous carriers handling an interstate shipment of goods."  See Reider v. Thompson, 339 U.S. 113, 119 (1950).  "The Carmack Amendment did this both by establishing a single uniform regime for recovery by shippers 'directly from [the] interstate common carrier in whose care their [items] are damaged,' and by 'preempt[ing][the] shipper's state and common law claims against a carrier for loss or damage to goods during shipment.'"  Project Hope, 250 F.3d at 73 n.6 (quoting Windows, Inc. v. Jordan Panel Sys. Corp., 177 F.3d 114, 117-18 (2d Cir. 1999); Ward v. Allied Van Lines, Inc., 231 F.3d 135, 138 (4th Cir. 2000)).  "Carmack effectively codified the strict liability rule that governed the liability of common carriers at common law."  Sompo Japan Ins. Co. of Am. v. Union Pac. R.R. Co., 456 F.3d 54, 59 (2d Cir. 2006) (citing Missouri Pac. R.R. Co. v. Elmore & Stahl, 377 U.S. 134, 137 (1964)), abrogated on other grounds by Kawasaki Kisen Kaisha Ltd. v. Regal-Beloit Corp., 130 S. Ct. 2433, 2440 (2010)).

Where the Carmack Amendment applies, "[i]n an action to recover from a carrier for damage to a shipment, the shipper establishes his prima facie case when he shows delivery in good condition, arrival in damaged condition, and the amount of damages."  Missouri Pac. R.R. Co., 377 U.S. at 137-38; accord Project Hope, 250 F.3d at 73 n.6.  Once a shipper makes this showing, a carrier seeking to avoid liability must demonstrate that the damage was caused not by negligence but "by (a) the act of God; (b) the public enemy; (c) the act of the shipper himself; (d)

public authority; (e) or the inherent vice or nature of the goods."  See Missouri Pac. R.R. Co.,
377 U.S. at 137 (1964) (citing Chesapeake & O. Ry. Co. v. A. F. Thompson Mfg. Co., 270 U.S.
416, 421-423; Adams Express Co. v. Croninger, 226 U.S. 491, 509 (1913); Hall & Long v.
Nashville & C.R. Co., 80 U.S. (13 Wall.) 367, 372 (1871)) (internal quotations omitted).

After "liability under the Carmack Amendment has . . . been established, '[t]he
inquiry then becomes the amount of damages and, usually, whether the carrier legitimately
limited its liability for the shipment to a specified value or amount.'"  St. Paul Fire & Marine Ins.
Co. v. Schneider Nat'l Carriers, Inc., No. 03 Civ. 5197, 2006 WL 522455, at *7 (S.D.N.Y. Mar.
3, 2006) (quoting A.I.G. Uruguay Compania de Seguros, S.A. v. AAA Cooper Transp., 334 F.3d
997, 1003 (11th Cir. 2003)).  Under the "reasonable opportunity" doctrine, in order to properly
limit its liability under the Carmack Amendment, a carrier must give the shipper a reasonable
opportunity to choose between two or more levels of liability.  See Travelers Indem. Co. of Ill. v.
Schneider Specialized Carriers, Inc., No. 04 Civ. 5307, 2005 WL 351106, at *5 n.4 (S.D.N.Y.
Feb. 10, 2005) (citing Rohner Gehrig Co., Inc. v. Tri-State Motor Transit, 950 F.2d 1079, 1081
(5th Cir. 1992) (en banc); Hughes v. United Van Lines, Inc., 829 F.2d 1407, 1415 (7th Cir.
1987), cert. denied, 485 U.S. 913)).

**B.**   **Applicability of the Carmack Amendment[8]**

    **1.**   **Distinction Between "Carrier" and "Broker"**

As a threshold matter, the "Carmack amendment imposes liability on 'carriers' but not on 'brokers,' as those terms are defined by the statute," and thus "it is critical to determine whether a defendant was acting as a carrier or as a broker in relation to the particular shipment that was damaged." AIOI Ins. Co. v. Timely Integrated, Inc., No. 08 Civ. 1479, 2009 WL 2474072, at *2 (S.D.N.Y. Aug. 12, 2009). "The difference between a carrier and a broker is often blurry." Nebraska Turkey Growers Coop. Assoc. v. ATS Logistics Servs., Inc., No. 4:05CV3060, 2005 WL 3118008, at *4 (D. Neb. Nov. 22, 2005) (citing Delta Research Corp. v. EMS, Inc., No. 04-60046, 2005 WL 2090890, at *5 (E.D. Mich. Aug. 29, 2005)). Here, this Court cannot determine as a matter of law whether UPS's role in the shipment was as a carrier or as a broker.

Under the statute, a "broker" is "a person, other than a motor carrier or an employee or agent of a motor carrier, that as a principal or agent sells, offers for sale, negotiates

---

[8]  The Supreme Court recently held that the Carmack Amendment does not apply to an inland rail segment of a shipment originating overseas under a single through bill of lading.  Kawasaki Kisen Kaisha Ltd. v. Regal-Beloit Corp., 130 S. Ct. 2433, 2442, 2449 (2010).  While Regal-Beloit involved rail rather than motor transport, Carmack applies regardless of the particular mode of transport.  See Royal & Sun Alliance Ins., PLC v. Ocean World Lines, Inc., 612 F.3d 138, 145 (2d Cir. 2010) (noting that Regal-Beloit applies to rail and motor carriers because the statutory language is substantially similar and the policy arguments are equally applicable); see also Sompo Japan Ins. Co. of Am. v. Union Pac. R.R. Co., 456 F.3d 54, 59 (2d Cir. 2006), abrogated on other grounds by Kawasaki Kisen Kaisha Ltd. v. Regal-Beloit Corp., 130 S. Ct. 2433, 2440 (2010) ("Carmack's applicability[] is identical regardless of the mode of transport." (citing Project Hope, 250 F.3d at 75)).

After the Supreme Court issued its decision in Regal-Beloit, this Court ordered the parties to submit supplemental briefing regarding its effect on this case.  (See Docket No. 36)  Both sides agree that Regal-Beloit is not applicable, because there was no through bill of lading here.  (See Pltf. Sep. 27, 2010 Ltr. at 1-2; Def. Sep. 27, 2010 Ltr. at 1-2)

for, or holds itself out by solicitation, advertisement, or otherwise as selling, providing, or

arranging for, transportation by motor carrier for compensation."  49 U.S.C. § 13102(2).

In contrast, a "motor carrier" is "a person providing commercial motor vehicle . . .

transportation for compensation."  Id. § 13102(14).

The implementing regulation provides that

[m]otor carriers, or persons who are employees or bona fide agents of carriers, are
not brokers within the meaning of this section when they arrange or offer to
arrange the transportation of shipments which they are authorized to transport and
which they have accepted and legally bound themselves to transport.

See 49 C.F.R. § 371.2(a).

Courts routinely deny summary judgment where there are issues of fact as to

whether an entity is a carrier.  See, e.g., Consol. Freightways Corp. of Del. v. Travelers Ins. Co.,

No. 00-CV-20726, 2003 WL 22159468, at *6 (N.D. Cal. Mar. 28, 2003) (finding summary

judgment inappropriate because triable issues of fact remained as to whether trade show

producer was a carrier or merely a broker when it arranged for transportation and also performed

some transportation functions, was listed as the carrier on one of the shipping forms, and sent a

letter thanking the shipper for "selecting GES Logistics to handle the transportation needs");

Hewlett-Packard Co. v. Brother's Trucking Enterprises, Inc., 373 F. Supp. 2d 1349, 1352 (S.D.

Fla. 2005) (denying summary judgment because reasonable fact finder could find that the

defendant acted as either motor carrier or broker where the defendant both arranged for

transportation and also exerted some measure of control over the drivers); Just Take Action, Inc.

v. GST (Americas) Inc., No. 04-3024 ADM/RLE, 2005 WL 1080597, at *5 (D. Minn. May 6,

2005) (denying summary judgment because triable issues of fact existed as to whether the

defendant played "the role of broker or motor carrier in shipping the fermenter tanks" when it

arranged for transportation with a separate motor carrier but also "drafted the bill of lading and directed how the shipment would take place").

      **2.**   <u>**Analysis**</u>

      UPS argues that the Carmack Amendment does not apply here because it did not act as a carrier, but merely "arranged for" delivery of the x-ray equipment from the Netherlands to the Texas hospital.  (Def. Reply Br. at 4, 7)  UPS further argues that it was never legally bound to transport the x-ray machine, that its employees or agents never touched the shipment until it arrived at the hospital parking lot in Texas, and that even then UPS employees or agents only performed an intrastate "switching service" between the parking lot and the hospital.[9]  AIG argues, however, that UPS acted as a carrier by, <u>inter alia</u>, controlling the shipment throughout the transportation process, providing transportation services, and transporting the equipment.[10] (Pltf. Reply Br. at 3-6)

      This Court concludes that there are genuine issues of material fact as to whether UPS was "providing commercial motor vehicle . . . transportation for compensation."  <u>See</u> 49 U.S.C. § 13102(14).  Similarly, under the implementing regulation, there are genuine issues of material fact as to whether UPS was authorized and legally bound to transport the x-ray machine. <u>See</u> 49 C.F.R. § 371.2(a).

---

[9]  Citing 49 U.S.C. § 14706(a)(1), UPS asserts that "[u]nder Carmack, a 'delivering carrier is deemed to be the carrier performing the line haul transportation nearest the destination, but[] <u>does</u> <u>not</u> include a carrier providing only switching service at the destination.'"  (Def. Reply Br. at 4-5 (quoting 49 U.S.C. § 14706(a)(1) (emphasis in original))  The significance of this distinction here is not explained and is not apparent.

[10]  In its supplemental September 27, 2010 letter brief concerning the Supreme Court's <u>Regal-Beloit</u> decision, AIG argues for the first time that – regardless of Carmack's applicability – UPS's limited liability argument fails under federal common law.  (Pltf. Sep. 27, 2010 Ltr. Br. 4) Having not made this argument in its moving brief and reply brief, AIG cannot raise it now, particularly given that the Court requested supplemental briefing concerning only the applicability of <u>Regal-Beloit</u> and its Second Circuit progeny.  (<u>See</u> Docket No. 36)

AIG has offered evidence that UPS provided, and was legally bound to provide, transportation of the x-ray equipment.  AIG argues that in responding to the RFQ, UPS agreed to provide "all door to room transportation services and inside delivery" for Philips's cargo (Pltf. R. 56.1 Stat. ¶ 1) and that UPS agreed to "transport [Philips's] freight according to [Philips's] specific guidelines."  (Id. ¶ 3)  AIG also cites Philips's January 19, 2004 e-mail to Emery and Menlo, in which Philips requested these companies "to pickup, transport, inside deliver and unpack [the x-ray equipment]."  (Id. ¶ 2; see also Eagan Decl., Ex. A)  AIG also offers Philips's February 16, 2004 invoice listing "Emery" as the "Mode of transport."[11]  (Eagan Decl., Ex. G at 1)

UPS has offered evidence, however, that it was obligated "only to monitor for potential delays – to 'watch' the shipment" (Def. R. 56.1 Stat. ¶ 10), and that it did not "even see . . . the product on an ocean ship until it actually [arrived at] the hospital."  (Gill Decl., Ex. 3 (Welsh Tr.) at 62)  UPS also offers testimony from the UPS manager overseeing the delivery at San Angelo stating that Philips directed all aspects of the inland transportation:

> Philips selected BTT to provide the inland transportation.  There were a couple of other trucking companies that haul ocean containers that Philips had contracts with, and . . . they told us these were the carriers that they were going to use to deliver the container to the hospital. . . . Philips had negotiated pricing and services with these . . . companies and they basically directed us . . . that this one would be delivered by BTT. . . . Philips set that whole thing up.  Philips negotiated the whole process with those inland haulers.  We had nothing to do with it. . . . Philips took care of [the inland trucking].

(Gill Decl., Ex. 4 (Whitrock Tr.) at 50-52, 121; Ex. 5 (Whitrock Decl.))  According to UPS, it did not exercise control over the transportation but acted merely as an arranger of the haulage, such that the Carmack Amendment does not apply and any liability limitation agreement entered

---

[11]  AIG has not argued that the October 24, 2003 UPS SOP (Eagan Decl., Ex. B) constitutes an enforceable agreement between the parties.

into between the shipper and UPS is enforceable.  (Def. Reply Br. 4)  Because there are material

issues of fact as to whether UPS was acting as a "carrier" or as a "broker" within the meaning of

the Carmack Amendment, AIG's motion for summary judgment will be denied.[12]

## IV.   THE APPLICABILITY OF THE MATERIAL DEVIATION
## DOCTRINE CANNOT BE DETERMINED AS A MATTER OF LAW

AIG argues that UPS's alleged failure to utilize cargo straps, extended forks, and

a trained forklift operator in delivering the x-ray machine constitutes material deviations from

the parties' agreement, thus invalidating the liability limitation clause.  (Pltf. Br. 17-19)

Under the material deviation doctrine, when a carrier breaches a material

provision of its contract with the shipper, a clause limiting liability will not prevent the shipper's

recovery, because the deviation justifies rescission of the entire carriage contract.  See Rocky

Ford Moving Vans, Inc. v. United States, 501 F.2d 1369, 1372 (8th Cir. 1974); The Sarnia, 278

F. 459, 463 (2d Cir. 1921) ("It has long been established law that a deviation changes the

character of a voyage so essentially that the shipowner who has deviated cannot claim the benefit

of the terms of the bill of lading.").

Here, for the reasons stated above, it cannot be determined as a matter of law

what agreement, if any, governed the shipment at issue.  Accordingly, this Court cannot

determine as a matter of law whether UPS materially deviated from its alleged agreement with

Philips in transporting the x-ray equipment from the parking lot into the hospital.[13]

---

[12]  UPS argues that AIG's claim is time-barred under the Carmack Amendment's statute of limitations.  (Def. Reply Br. 7)  Because the applicability of the Carmack Amendment cannot be determined as a matter of law, the Court does not reach this issue.

[13]  There are likewise material issues of fact as to whether Philips requested a trained forklift operator, cargo straps, and extended forks.  For example, UPS offers a declaration from its manager stating that Philips never requested extended forks (Gill Decl., Ex. 5 at 1), while AIG offers a Direct Delivery Questionnaire in which Philips requests extended forks and cargo straps. (Gill Decl., Ex. 5 (Whitrock Decl. Ex. 1); Def. R. 56.1 Stat. ¶ 44)  There are also issues of fact as

**V.     UPS IS ENTITLED TO SUMMARY
        JUDGMENT ON AIG'S TORT CLAIM**

UPS has moved for summary judgment as to AIG's tort claim, arguing that it is time-barred. AIG "does not oppose" UPS's motion. (Pltf. Br. 1 n.2) Accordingly, UPS's motion for summary judgment as to the tort claim will be granted.

## CONCLUSION

For the reasons stated above, Defendant UPS's motion for summary judgment (Docket No. 17) is granted as to Plaintiff's tort claim but otherwise denied. Plaintiff AIG's cross-motion for summary judgment (Docket No. 22) is denied. The Clerk of the Court is directed to terminate the motions.

The parties are directed to consult and comply with Rule 9 of this Court's Individual Rules with respect to submission of a joint pretrial order within 30 days of this decision.

Dated: New York, New York
       February 14, 2011                    SO ORDERED.

                                            _____
                                            Paul G. Gardephe
                                            United States District Judge

---

to whether Korba, the forklift operator, was properly trained. At his deposition, Korba denied receiving any formal training (Gill Decl., Ex. 2 (Korba Tr.) at 57-58), but Korba's co-worker offered a declaration stating that both he and Korba were properly trained. (Gill Decl., Ex. 10 (Henry Decl.))